UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ERGELI DEMIR VE CELIK FABRIKALARI
T.A.S.,

        Plaintiff,

    -v-                                   No.  08 Civ. 10892 (LTS)(HBP)

MMX CORUMBA MINERACAO LTDA and
MMX TRADE & SHIPPING (NEVADA) LLC,

        Defendants,

    -and-

INTERBARGE S.A. and THE GOVERNOR
AND COMPANY OF THE BANK OF
IRELAND,

        Intervening Plaintiffs.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        Plaintiff Eregli Demir Ve Celik Fabrikalari T.A.S.[1] ("Plaintiff") commenced the

instant case on December 15, 2008, and the Court granted Plaintiff's request for an order for the

issuance of process of maritime attachment against Defendants MMX Corumba Mineracao LTDA

and MMX Trade & Shipping (Nevada) LLC (collectively, "Defendants") the next day, in the

amount of $27,180,979.93 pursuant to Rule B of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure.  Defendants moved on February 4, 2009,

to vacate the attachment order pursuant to Rule E(4)(f), Intervening Plaintiffs Interbarge S.A. and

---

[1]     The parties have indicated that the caption spelling of the Plaintiff entity's name is
incorrect in that "Ergeli" ought to be spelled "Eregli."  The Clerk of Court is
respectfully requested to amend the name of Plaintiff in the caption to read, "Eregli
Demir Ve Celik Fabrikalari T.A.S."

The Governor and Company of the Bank of Ireland (collectively, "Intervenors") intervened in this action and joined Defendants in moving to vacate the attachment order to the extent that it reaches a specific bank account, and a hearing was held on February 13.  The motions have since been fully briefed.

The Court has considered thoroughly the parties' submissions and arguments.  For the following reasons, Defendants' motion to vacate is granted in part and denied in part, and Intervenors' motions to vacate are denied.

<u>DISCUSSION</u>

According to Rule E(4)(f) of the Supplemental Rules, "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."  In order to sustain an attachment, a plaintiff must prove that it has satisfied the "filing and service requirements of Rules B and E" and that, among other requirements not relevant here, it has a valid <u>prima facie</u> admiralty claim against the defendants.  <u>See</u> <u>F.H. Bertline Holding KG, Ranhill Engineer ands Constructors</u>, No. 08 Civ. 2003 (SAS), 2008 WL 2693630, *3 (S.D.N.Y. July 9, 2008) (citing <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 460 F.3d 434 (2d Cir. 2006)).  However, "maritime plaintiffs are not required to prove their case at this stage."  <u>EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD</u>, 582 F. Supp. 2d 466, 468 (S.D.N.Y. 2008) (citation omitted).  Indeed, "a detailed discussion of the merits . . . has little bearing on the motion to vacate, which is decided based on whether a prima facie claim is shown and technical requirements for attachment have been met."  <u>Chiquita Int'l Ltd. v. M.V. Bosse</u>, 518 F. Supp. 2d 589, 597 (S.D.N.Y. 2007) (citing <u>Aqua Stoli</u>).

*Defendants' Motion to Vacate*

Defendants assert that the attachment order ought to be vacated because, underline inter alia,
it is based on claims that are not admiralty or maritime in nature as required by Rule B.  According
to Folksamerica Reinsurance Company v. Clean Water, 413 F.3d 307, 312 (2d Cir. 2005), in
determining whether the subject matter of a contract at issue is maritime in character, courts must
first conduct a threshold inquiry into the subject matter of the dispute.  In this case, according to the
Verified Complaint and the declarations submitted in connection with the instant motion practice,
the dispute is over whether Defendants are liable to Plaintiff for damages arising from Defendants'
alleged failure to provide and deliver ore in 2007, and their alleged failure to deliver ore in 2008.
Both breaches implicate maritime interests.  The failure to deliver by ship is clearly maritime, and
the failure to provide the actual ore has more than a "speculative and attenuated" connection with
maritime commerce.  See Folksamerica, 413 F.3d at 312-13.  The requirements of the threshold
inquiry have thus been met in this case.

The Court must next consider the subject matter of the contract.  The traditional rule
was that admiralty jurisdiction existed only over contracts, claims and services that were purely
maritime in nature.  However, mixed contracts -- contracts that contain both maritime and non-
maritime elements -- may also support admiralty jurisdiction in two circumstances: 1) where the
principal objective of the contract is maritime commerce; and 2) where the claim arises from a
breach of maritime obligations that are severable from the non-maritime obligations under the
contract.  See Folksamerica 413 F.3d at 315 (citing Norfolk Southern Railway Company v. Kirby,
543 U.S. 14 (2004)).  The contract is mixed in this case, as it contains both non-maritime elements
(the purchase and sale of ore), and maritime elements (the shipping of the ore).  The Court must

therefore consider whether either of the two exceptions applies.

With respect to the first exception, Plaintiff has failed to prove at a prima facie level that the primary objective of the contract was maritime commerce, that is, that the primary objective of the contract was to "accomplish the transportation of goods by sea." Folksamerica, 413 F.3d at 314) (citing Norfolk, 543 U.S. at 24). Most of the provisions in the contract are dedicated to detailing the composition and quality of the ore sought by Plaintiff. While the contract contains terms concerning shipping, the structure of the contract makes clear that the principal objective of the contract was the purchase and sale of ore. Accordingly, the "principal objective" exception has not been met in this case.

As to the second exception, with respect to the claim that Plaintiff paid an additional $4,145,126.15 for substitute ore in 2007 because Defendants failed to provide and transport an ore shipment that year, Plaintiff has failed to meet its prima facie burden of demonstrating that the attachment is premised on the breach of maritime obligations severable from the non-maritime obligations imposed by the contract. The Verified Complaint does not specify what portion of the approximately $4 million, if any, was attributable to the transportation costs for the substitute ore (as opposed to the cost of substitute ore itself), and counsel for Plaintiff admitted at oral argument that the $4 million did not include a freight component. (Tr. at 16.) Accordingly, that claim does not arise from a breach of maritime obligations at all, but from a non-maritime obligation for the ordinary purchase and sale of ore. Because Plaintiff has not demonstrated that the claim based on the alleged breach in 2007 falls under either exception, Defendants' motion to vacate is granted insofar as the attachment order is premised on the $4,145,126.15 in alleged losses suffered in 2007.

However, as to Plaintiff's claim that Defendants breached the contract by failing to provide transportation for certain ore shipments in 2008, resulting in additional substitute shipment

costs of $17,204,502, Plaintiff has met its <u>prima facie</u> burden of demonstrating the applicability of

the second exception.  Whether a maritime obligation is severable from the non-maritime portions

of a contract depends upon whether the "maritime subject matter is capable of being divided from

the rest so that the rights of the parties which flow from the non-maritime part of the contract may

be, if necessary, litigated separately and only that part which is maritime be put in issue in the

admiralty suit."  <u>Berwind-White Coal Mining Co. v. City of New York</u>, 135 F.2d 443, 447 (2d Cir.

1943); <u>see also</u> <u>Compagnie Francaise de Navigation a Vapeur v. Bonnasse</u>, 19 F.2d 777, 779 (2d

Cir. 1927) ("The substantial question is whether the maritime obligations can be separately

enforced without prejudice to the rest"); <u>Tropwood, A.G. v. Tae Change Wood Indus. Co., Ltd.</u>,

454 F. Supp. 964, 966 (N.D. Ill. 1978) ("The maritime issue must be capable of litigation without

reference to the balance of the contract") (citing <u>Berwind-White</u> and <u>Compagnie</u>).

   Defendants argue that the 2008 claim concerning Defendants' alleged failure to

provide freight cannot be litigated separate and apart from the 2007 non-maritime claim that

Defendants failed to provide ore, because the 2008 shipment arrangement was made as a result of

Defendants' alleged failure to provide ore in 2007.  However, even if this were true as a factual

matter, nothing in the Verified Complaint suggests that Plaintiff must be able to prove the breach of

non-maritime obligations in 2007 in order to recover on its claim for the breach of maritime

obligations in 2008.  The Verified Complaint alleges simply that Defendants were obligated to

provide freight in 2008 under the terms of the contract, and that Defendants failed to do so.  This

allegation implicates provisions of the contract concerning freight conditions and freight payments,

which are separate from provisions concerning the quality of the ore and payment for the ore itself.

(<u>See, e.g.</u>, ¶ 8.1(A) ("Payment for Lumpy Iron Ore") and ¶ 8.1(B) ("Payment for Freight of Lumpy

Iron Ore") of the contract, annexed to Decl. of Ozan Bekci dated February 10, 2009, as Ex. A.)

Nothing in the contract suggests that construing the separate freight payment provisions would require the determination of issues under any non-maritime aspect of the contract.  Plaintiff has therefore satisfied its <u>prima facie</u> burden of demonstrating the severability of the maritime claim upon which the attachment order is based.  Accordingly, the attachment order as premised on the remaining $17,204,502 in additional shipping costs allegedly incurred in 2008 will not be vacated.

For these reasons, Defendants' motion to vacate is granted to the extent the attachment order was premised on the alleged $4,145,126.15 in additional costs incurred in 2007, and denied in all other respects.  The original attached amount, $27,180,979.93, included the accumulation of interest on the principal amount of $21,349,628.15 over three years at a rate of 7.5%, compounded quarterly, and $500,000 in expected attorneys' fees.  After deducting $4,145,126.15 from the original principal amount, recalculating the accrual of interest, and subtracting $100,000 from the estimated attorneys fees to reflect an estimated portion of the fees spent litigating the 2007 claim in arbitration, the order for the issuance of process entered on December 16, 2008, will be amended so as to reach property of the defendant in the amount of $21,900,747.90.

<u>*Intervenors' Motions to Vacate*</u>

On January 13, 2009, after being served with the attachment order, Citibank N.A. ("Citibank") froze one of Defendants' accounts which held approximately $18,480,000 in funds (the "Citibank account").  Intervenors move to vacate the attachment order to the extent it has reached the Citibank account, on the basis of their asserted prior perfected security interests in the Citibank account.  Plaintiff does not dispute, for purposes of this motion practice, that Intervenors each have a prior security interest in the Citibank account that was perfected pursuant to state law

before the attachment order was served on Citibank.

Rule B of the Supplemental Rules provides for the attachment of a "defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process."  The attachment order was levied upon Citibank after Intervenors had perfected their security interest in the Citibank account.  Therefore, Defendants' attachable "property" at the time of attachment includes the Citibank account only to the extent of Defendants' interest in that account, if any, that is junior to Intervenors' perfected security interest.  Cf. United States v. Bellomo, 263 F. Supp. 2d 561, 573 (E.D.N.Y. 2003) ("Property is the right of any person to possess, use, enjoy and dispose of a thing.  The term, although frequently applied to the thing itself, in strictness means only the rights of the owner in relation to it.") (quoting Wynehamer v. The People, 13 N.Y. 378 (1856)).[2]

Intervenors' motions to vacate the attachment of the Citibank account are denied without prejudice.  Intervenors have proffered no facts indicating that they have a current right to take possession of the money, nor have they made a showing of any compelling circumstances indicative of prejudice to their interests in the attached funds arising from this attachment that would justify vacatur at this juncture.

---

[2]     Plaintiff argues that federal maritime law preempts state law in this case, citing, inter alia, Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), which held that funds involved in electronic fund transfers ("EFT") between banks were considered "property" subject to attachment under Rule B, notwithstanding contrary state law.  Plaintiff, however, cites no federal authority that would preempt the relevant provisions of state law concerning the priority of perfected security interests. See Winter Storm, 310 F.3d at 275 ("while 'Federal law generally governs questions as to the validity of Rule B attachments,' state law may be borrowed if there is no federal admiralty law in point on the particular question presented.") (quoting Reibor Int'l Ltd. v. Cargo Carriers (KACZ-CO.) Ltd., 759 F.2d 262, 265 (2d Cir. 1985)); id. at 276-77 (holding that federal admiralty law considers funds involved in EFT's to be "property").  Therefore, Plaintiff's argument that the attachment gives it rights superior to those of the Intervenors is rejected.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to vacate is granted to the extent that the amount subject to the write of attachment will be reduced to $21,900,747.90, and Intervenors' motions to vacate are denied without prejudice. Plaintiff is directed to submit an amended Order of Attachment through the Orders and Judgments Clerk. The Clerk of Court is respectfully requested to terminate Docket Entry No. 8.

SO ORDERED.

Dated: New York, New York
      April 1 , 2009

LAURA TAYLOR SWAIN
United States District Judge